[Civ. No. 21864. Second Dist., Div. Three. Apr. 5, 1957.]

ELLA JANE GOLDSTRASS, an Incompetent Person, etc., Appellant, v. SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association) et al., Respondents.

John W. Fay for Appellant.

Belcher, Kearney & Fargo, Leslie F. Olson, Snyder & Fletcher, W. Cloyd Snyder and Henry Melby for Respondents.

WOOD (Parker), J.—Action for damages allegedly resulting from fraud and conspiracy in inducing the execution of a trust agreement. Plaintiff Ella J. Goldstrass was the trustor under the agreement. She appeared as plaintiff by her guardian *ad litem*, Frederick McCann (her brother). She died prior to the trial and Frederick McCann, the executor of her will, was substituted as plaintiff. Defendant Security-First National Bank of Los Angeles, hereinafter referred to as the bank, was trustee under the agreement. In a jury trial, motions for nonsuits were granted as to defendants Hasbrouck, Smith, Empey and Mossoni. A motion by the bank for a directed verdict was granted, and a verdict in favor of the bank was returned, and judgment was entered thereon. Plaintiff appeals from the judgments.

Appellant contends that there was sufficient evidence to require that the case be submitted to the jury.

On December 31, 1948, Mrs. Goldstrass executed a revocable trust agreement wherein the bank was named trustee. The agreement provided, in part, that the income from the trust should be paid to Mrs. Goldstrass monthly during her lifetime; and that the trustee, subject to the discharge of its fiduciary obligations, was vested with all the rights of an owner of the trust property. A schedule, attached to the trust agreement, listed the property which was delivered to the bank, as trustee. The schedule listed two parcels of real property and a draft for $950.61 drawn on a term account in the Glendale office of the bank. One parcel of real property was the house and lot where Mrs. Goldstrass resided, and the other parcel was property which was leased to the Zinke Shoe Company on a long term lease. The trust agreement was amended on February 1, 1949, to provide that the net income of the trust should be added to the principal, forming a common fund, and that the trustee should distribute the common fund to or for the benefit of Mrs. Goldstrass at her request, excepting that if, in the opinion of the trustee, she became incapacitated the trustee might use as much of the fund for her benefit as the trustee deemed advisable. The bank accepted the trust and acted as trustee (until a successor was appointed as hereinafter stated).

The value of the two parcels of real property as determined by the bank on July 8, 1949, for the purpose of fixing its fee as trustee, was $53,775. On February 1, 1950, Mrs. Goldstrass authorized the bank to sell the residence, and the bank sold it "as of" November 1, 1950, for $12,000.

About August 1, 1950, Mrs. Goldstrass was adjudged incompetent, and Hilda Ross (stepdaughter of Mrs. Goldstrass) was appointed guardian of her person and estate.

On May 14, 1952, prior to filing the present action, Mrs. Goldstrass, acting through Frederick McCann as her guardian *ad litem,* commenced another action against the bank seeking an accounting, the removal of the bank as trustee, and the appointment of another trustee. Frederick McCann, individually, was also a plaintiff in that action. Further relief sought by him in that action was the payment to him of certain amounts which he allegedly had paid for the support of Mrs. Goldstrass. The bank answered that complaint and also filed an account and resignation as trustee. Mr. Hasbrouck appeared as one of the attorneys for the bank in that action. Mrs. Goldstrass, through her guardian *ad litem,* filed objections to the account of the trustee and alleged that the sale of Mrs. Goldstrass' house and lot (residence) was in bad faith and that she was damaged thereby in the amount of $7,000. The court overruled the objections, approved the account, accepted the resignation of the trustee, and appointed another trustee (Crules R. Cheek). The decree in that action was entered February 9, 1953. The bank transferred all the assets of the trust to the successor trustee.

The present action (for damages allegedly resulting from fraud and conspiracy in inducing the execution of the trust agreement) was commenced April 13, 1953.

The allegations regarding fraud and conspiracy, in the sixth amended complaint, in the present action were in substance as follows: Defendants unlawfully conspired to make representations to induce Mrs. Goldstrass to execute the trust agreement "wherein and whereby" defendants would obtain profit and income for themselves. Defendants, in furtherance of the conspiracy, falsely represented to Mrs. Goldstrass that: Frederick McCann was not taking proper care of her and had abandoned her; he had collected the rentals from her residence and converted them to his own use; he had sold her furniture and converted the proceeds to his own use; he had not insured her residence against loss by fire; the rentals from the Zinke property were not being collected or were being collected by Mr. McCann and were being converted to his own use; a trustee was necessary in order to provide for her care and to manage her property; if she executed the trust agreement the bank would provide for her care out of the trust property and take care of her. Also, in furtherance of the conspiracy,

defendants withheld from Mrs. Goldstrass information concerning provisions which her brother had made for her support during her illness, and information that the rents from the Zinke property were being deposited in her checking account. Plaintiff was incompetent to execute a trust agreement at the time when such representations were made and when such information was withheld. Plaintiff relied upon the representations alleged to have been made by defendants and was induced thereby to execute the trust agreement.

Said amended complaint also alleged that, subsequent to the execution of the trust agreement, the defendants committed various acts for the purpose of furthering and concealing the fraud and conspiracy. Plaintiff sought damages consisting of: trustee's fees and charges and attorneys' fees allowed in the previous action of plaintiff against the bank; loss of interest on money which the bank as trustee allegedly failed to invest; the difference between the alleged market value of the residence and the amount for which the trustee sold the residence; loss of services which Mr. McCann could have furnished to plaintiff without cost to her. Plaintiff also sought punitive damages.

The answers denied the allegations of fraud, conspiracy, and damages. Some of the answers alleged various affirmative defenses, including res judicata, statute of limitations, and estoppel.

The court granted motions of defendants to strike from said amended complaint (1) the allegation as to loss of interest on money which the bank as trustee allegedly failed to invest; and (2) the allegations as to damages allegedly sustained by Mrs. Goldstrass through the sale of her residence by the trustee.

The evidence was, in substance, as follows: About 1923, Mrs. Goldstrass and her husband became residents of Glendale, California. About August, 1947, Mr. Goldstrass died, and shortly thereafter, Mr. McCann came to California from his home in New Jersey and remained here for a few weeks. While he was in California, Mrs. Goldstrass gave him about $12,000 to invest for her. She accompanied him on his return to New Jersey and remained there until December, 1947, when she returned to California. Mr. McCann invested the money, which he had received from her, in a corporation in which he was the principal investor. The corporation operated a coal mine. About June, 1948, Mrs. Goldstrass became seriously ill and was hospitalized, and Mr. McCann came to California to take

care of her. About July, 1948, at the direction of Mr. McCann, Mrs. Goldstrass was moved from the hospital to a sanitarium which was operated by defendant Irene Mossoni. After Mr. McCann came to California he took care of the business affairs of Mrs. Goldstrass and disposed of her furniture and leased her residence. While Mr. McCann was in California (about four months), monthly rental checks of $175 each from the Zinke Company were deposited in the checking account of Mrs. Goldstrass in the Glendale branch of the bank. Those Zinke checks were endorsed, "Deposited to the credit of" Mrs. Goldstrass, by D. H. Smith. Mr. Smith was vice-president of the bank, at the Glendale branch. Mr. McCann, with the permission of Mr. Smith, drew checks on the checking account of Mrs. Goldstrass for her care. In October, 1948, Mr. McCann returned to New Jersey. Before returning there, he informed Mr. Smith that he had arranged with the Zinke company to have its rental checks sent to the bank each month. Mr. McCann also made arrangements for a real estate broker to collect the rental on the residence of Mrs. Goldstrass, deduct a commission of 5 per cent, and forward the balance to Mr. McCann in New Jersey.

When he returned to New Jersey he was informed that the coal mine, in which he had invested Mrs. Goldstrass' money, had been flooded. He closed the mine, and the assets of the corporation were sold. No part of the money, which he invested for Mrs. Goldstrass, was returned to her. Mr. McCann continued to write checks on Mrs. Goldstrass' account for her care. On November 7, 1948, Mr. McCann wrote a letter to the bank,[1] wherein he requested Mr. Smith to "O.K." an enclosed check and forward it to the sanitarium; he asked Mr. Smith to advise whether the Zinke rent for November had been deposited; he said Mrs. Goldstrass could not handle her affairs; he asked for copies of bank statements. On November 20

---

[1] "Herewith check payable to Laurel Sanitarium, W. Laurel St., Glendale, Cal. in amount $267.87 where Mrs. Ella J. Goldstrass is and payments to Sanitarium is due. I enclosed addressed envelope so you can let go forward to them. I send yours to your bank for O.K. rather than direct and little delay will occur.

"Will you be good enough to advise if Zinki send you Nov. rent $175.00 for deposit to credit of Mrs. Goldstrass. Before leaving Glendale I telephoned Zinki Glendale office. Mr. Zinki was not there so I gave his secy my request to mail you hereafter each month $175.00 rent rather than Mrs. Goldstrass who you know can't handle her affairs, by reason of your kindness I have been ask to do so. Zinki office said they would do it.

"Please send me copies of Sept. Oct. and November bank statements. From Nov. on mail to me. Will you change your records accordingly."

Mr. Smith replied to the letter,[2] stating that he had mailed the check to the sanitarium; Zinke's had not paid the rent due November 1; there was only one cancelled check and it had been sent to Mrs. Goldstrass' home address; two of her friends, Mrs. Friend and Mrs. Empey, had been to the bank with a check for $35, which was signed by Mrs. Goldstrass, and the bank cashed the check. A check of the Zinke Company, dated "11-1-48," for $175 and payable to Mrs. Goldstrass was endorsed by Mr. Smith for deposit to the credit of Mrs. Goldstrass, and was deposited in her checking account on November 27, 1948. Another check of the Zinke Company, dated "12-1-48," for $175 and payable to her was similarly endorsed and deposited on December 1, 1948. About December 3, 1948, Mr. McCann paid $275.15 to the sanitarium for the care of Mrs. Goldstrass. The payment was made by a check which was signed "Ella J. Goldstrass Frederick McCann By authority." The check was presented to the Glendale branch of the bank on December 17, 1948, and on the approval of Mr. Smith, was paid from Mrs. Goldstrass' checking account. When the trust agreement was executed on December 31, 1948, the balance in the checking account of Mrs. Goldstrass was $102.17. On January 3, 1948, $175 was deposited in the checking account. That account was not listed in the property schedule attached to the trust agreement, and the funds in that account were not transferred to the bank as trustee. The term account of Mrs. Goldstrass, which was listed in the schedule attached to the trust agreement, was transferred to the bank as trustee by a check dated December 31, 1948, and signed by Mrs. Goldstrass.

Defendant Hasbrouck, called as a witness under section 2055 of the Code of Civil Procedure, testified as follows: He is an attorney at law and had practiced in Glendale since 1927. He had performed legal services for Mrs. Goldstrass at various times commencing in 1947. About December 23,

[2] "Your letter dated November 7th has been received. I mailed the check to the Laurel Sanitarium as requested. Zinke's have not paid to the Bank the rent which was due November 1.

"In regard to sending you Mrs. Goldstrass' cancelled checks and statement, there was no checks in September and only one in October, which has been mailed to your sister at her old home address.

"Two friends of your sister, Mrs. Friend and Mrs. Empey, called at the Bank yesterday with a $35.00 check signed by your sister. The signature was very normal. They advised the money was being used to buy a robe, slippers and other accessories for your sister, and which they said she needs very badly. The check was properly signed and there was nothing for me to do but to cash it."

1948, the attendant at the sanitarium called him and requested him to come to see Mrs. Goldstrass. About December 27, 1948, he went to the sanitarium and talked with Mrs. Goldstrass. She told him that she wanted to transfer her property to the defendant bank and let the bank take care of it for her. He mentioned a trust and told her that if she transferred her property, under an arrangement whereby the bank took charge of her property and paid her expenses from her funds, a trust would be created. Mrs. Goldstrass also said that "if she turned the property over" she wanted to be free from worry. He told her that if she had the property in the hands of someone who could properly take care of it, she would not have to worry and could try to get well. Mrs. Goldstrass at that time was seated in a wheelchair and seemed strong and alert. Thereafter he called the head office of the bank and requested that a trust officer be sent out to discuss a trust matter with him. A few days later he went to the sanitarium with Mr. Bell, who was a trust officer of the bank. He introduced Mr. Bell to Mrs. Goldstrass, and Mr. Bell told her the procedure of the bank in trust matters. On December 31, 1948, he went to the sanitarium again with Mr. Bell and read to Mrs. Goldstrass the trust agreement, which had been prepared by some one at the bank. He told her that it was the usual form which the bank used and that the charges were the customary charges which the bank put in all its trusts. She signed the agreement. He was not sure that he was present when she signed the amendment but he believed he was. All the legal documents concerning the trust were prepared by the bank. Mrs. Empey was not present when he discussed the trust agreement with Mrs. Goldstrass and she was not present when the agreement was signed. He had known Mr. Smith for many years. He did not discuss the trust agreement with Mr. Smith prior to the time the agreement was signed.

Mr. Bell, called as a witness under section 2055 of the Code of Civil Procedure, testified as follows: He is and had been a trust advisor for the bank for 15 years. He might have talked with Mr. Smith about the trust agreement three times before the agreement was made, but he (Bell) did not recall what the conversation was. He went to the sanitarium about December 22 or 23, 1948, with Mr. Hasbrouck and talked with Mrs. Goldstrass. She told him that she had a residence, and she also had property which was leased to Zinke. She also told him that her brother had gone east and left her by herself with no one to take care of her business and

financial affairs. She asked him if the bank "might be able" to take over and manage her properties for her. He told her what the charges would be if the bank accepted the manage- ment of her business affairs. The trust agreement was drawn by Mr. Humphrey (apparently an employee of the bank) and was the regular form of trust agreement used by the bank. He (Bell) went to the sanitarium again with Mr. Hasbrouck on December 31, 1948, and Mr. Hasbrouck read the trust agreement to Mrs. Goldstrass. The trust agreement was signed by Mrs. Goldstrass in his presence. He never discussed the trust agreement with Mrs. Empey and he did not see her the day the agreement was signed.

Mr. Smith, called as a witness under section 2055 of the Code of Civil Procedure, testified in part as follows: He had no recollection as to the manner in which the Zinke checks came to him. He recalled only one occasion when a Zinke check was delayed, and he wrote to Mr. McCann stating that the rent had not been paid. He did not recall talking to Mr. Bell regarding a trust agreement. His only recollection of talking with Mrs. Empey regarding Mrs. Goldstrass' affairs was that he talked with her when she and Mrs. Friend came to the bank with a $35 check which had been signed by Mrs. Goldstrass. They told him that Mrs. Goldstrass needed cer- tain clothing and other things. He cashed the check.

As above stated, appellant contends tha there was sufficient evidence to require that the case be submitted to the jury. His principal argument is to the effect that the evidence showed, or that the jury could have inferred, as follows: That in November, 1948, Mr. Smith "initiated" the execution of the trust agreement. The Zinke Company paid the rent promptly for 15 years, and mailed the rental checks directly to the Glendale branch of the bank. The Zinke Company mailed the rental check for November, 1948, to the bank on November 1, promptly as usual, and that Mr. Smith "set that check aside," and did not deposit it until November 27, in order to cause Mrs. Goldstrass to believe that the rent was not being collected and thereby induce her to execute the trust agreement. On December 17, 1948, Mr. Smith sent Mr. Bell to the sanitarium to solicit the trust agreement from Mrs. Goldstrass. In order to induce Mrs. Goldstrass to execute the trust agreement, Mr. Smith and Mr. Bell withheld from her the information that the Zinke rentals were being collected. Mr. Smith prepared the property schedule, which was attached to the trust agreement, and in order to conceal the information

that the Zinke rentals were being collected, he did not list Mrs. Goldstrass' checking account in the schedule. Mrs. Goldstrass was led, by such actions of Mr. Smith and Mr. Bell, to believe that the Zinke rentals were not being collected and that she executed the trust agreement to assure the collection of the Zinke rentals.

Appellant argues further that the jury could have inferred that Mr. Hasbrouck and Mrs. Empey joined in the alleged fraud of Mr. Smith.

██ There was no evidence that Mrs. Goldstrass made any inquiry of Mr. Smith or Mr. Bell concerning the Zinke rentals or that either of them withheld from her any information concerning such rentals. There was no evidence that Mrs. Goldstrass knew that there was a delay in the deposit of the Zinke rental check for November, 1948. Mr. Smith, in his letter of November 20 to Mr. McCann (above quoted), advised Mr. McCann that the check had not been received. There was no evidence, however, that Mr. McCann or any one communicated the information to Mrs. Goldstrass that the check had not been received. Mr. McCann testified that he did not write to Mrs. Goldstrass in 1948 after he had returned to New Jersey. He also testified that while he was in California he deposited the Zinke checks in Mrs. Goldstrass' checking account. Mr. McCann left California in October, 1948, and in his letter of November 7 to Mr. Smith, he stated that before he left Glendale, he telephoned the Zinke office and requested Mr. Zinke's secretary to mail the checks to the bank ''rather than Mrs. Goldstrass.'' Mrs. Empey testified, without objection, that about November, 1948, she received a letter from Mr. McCann in which he stated that he had not received the Zinke check (apparently referring to the November check), and in which he requested her to go to the Goldstrass house and see if the mail had been held up. She testified further that she went to the house several times but the tenant was not there; she finally got the check and took or forwarded it to the bank. There was no evidence that Mr. Smith prepared the property schedule and there was no evidence that Mrs. Goldstrass' checking account was omitted from the schedule in order to conceal the information that the Zinke rentals were being collected. It does not appear how or in what manner the listing of the checking account in the schedule would have disclosed to Mrs. Goldstrass the information that the Zinke rentals were being collected. The balance in that account on December 31, 1948 (the date of the trust agreement), was

$102.17, which amount was less than the Zinke monthly rental. There was no evidence that Mrs. Goldstrass was led, by any action of Mr. Smith or Mr. Bell, to believe that the Zinke rentals were not being collected.

Appellant, in support of his argument that Mr. Smith "initiated" the execution of the agreement, refers to an alleged inconsistency as between the testimony of Mr. Bell in his deposition and the testimony of Mr. Hasbrouck at the trial with reference to the date when Mr. Bell first saw Mrs. Goldstrass. Mr. Bell testified, in his deposition of January 7, 1954, that he first met Mrs. Goldstrass "about two weeks" before December 31, 1948, and introduced himself to her. (He testified at the trial that he first met her on December 22 or 23.) Mr. Hasbrouck testified at the trial that he first went to the sanitarium to see Mrs. Goldstrass about December 27, 1948; that he and Mr. Bell went to the sanitarium a few days later and he introduced Mr. Bell to Mrs. Goldstrass. Mr. Bell's deposition was taken about five years after December, 1948; and the trial was about seven years after December, 1948. Under such circumstances the minor differences in the testimony of the two witnesses as to those details— the date when Mr. Bell first saw Mrs. Goldstrass, and who introduced Mr. Bell to her—are of no significance and do not indicate fraud or conspiracy or that Mr. Smith "initiated" the execution of the agreement. There was no evidence of any fraud on the part of Mr. Smith.

Appellant argues to the effect that the jury could have inferred that Mr. Hasbrouck joined in the alleged "fraudulent action of Mr. Smith." That argument seems to be based upon an assumption by appellant that it could also be inferred from the evidence that Mr. Hasbrouck did not make a proper investigation of Mrs. Goldstrass' affairs; that such an investigation by him would have disclosed "fraudulent action" by Mr. Smith; that Mr. Hasbrouck permitted Mrs. Goldstrass to enter into the trust agreement after he had "observed" that she was incompetent. That argument also seems to be based upon the evidence that Mr. Hasbrouck was one of the attorneys for the bank in the other action, hereinabove referred to, wherein Mr. McCann, as guardian *ad litem* and individually, sought an accounting, removal of trustee, and recovery of money advanced by him. As above stated, there was no evidence of any fraudulent action by Mr. Smith. There was no basis for an inference that an investigation by Mr. Hasbrouck would have disclosed any such action by Mr.

Smith. There was no evidence that Mr. Hasbrouck observed that Mrs. Goldstrass was incompetent. Mr. Hasbrouck testified that he concluded that Mrs. Goldstrass was competent at the time she executed the trust agreement. He testified in his deposition that he discussed with her the matter of guardianship or having the bank as trustee. He testified at the trial that there was nothing about the circumstances that suggested to him that there should be a guardianship. The appearance by Mr. Hasbrouck as one of the attorneys for the bank in the other action was no basis for an inference that Mrs. Goldstrass was fraudulently induced to execute the trust agreement. There was no evidence that Mr. Hasbrouck joined in or committed any fraud.

Appellant argues further to the effect that the jury could have inferred that Mrs. Empey "joined in to conceal and further the fraud complained of." He (appellant) states in his brief that Mrs. Empey advised him that Mrs. Goldstress was better at the time she signed the agreement than she was when she became sick, that Mrs. Goldstrass "now hated" him, and he "was not to come back to Glendale because his sister would not give him a chance to make a fool of her again." He also states in his brief that Mrs. Empey led Mrs. Goldstrass to believe that he had abandoned her; and we "have a situation where Mrs. Empey played the brother against the sister and the sister against the brother, and neither the brother nor the sister could understand how the other could be so ungrateful." It seems that appellant's argument is that Mrs. Empey concealed alleged fraud of Mr. Smith with reference to the Zinke rent not being paid; that she caused an estrangement between Mrs. Goldstrass and Mr. McCann; and she was present when the trust agreement was executed. Apparently the argument is based upon two letters written by Mrs. Empey to Mr. McCann. One letter, dated December 5, 1948, stated: "I checked with Mr. Smith on Dec 2nd and found the Zinki check had been received and credited. Met Mr. Johnson and asked if the Broadway tenant had paid and he said yes so 'all is well.' . . . I told her you had to rent the house on account of the insurance. . . . She asks about her bills—is Zinki paying his rent—etc and we side step. In view of the fact that she had the 'go home' idea I told her the house had to be rented. I am sure she won't sign anything harmful because as I said before she is alert about her property and money." The other letter, dated January 2, 1949, stated: ". . . I went to see

her [Mrs. Goldstrass] on Friday and found her busily engaged with two men from the bank's trust department. She has turned over her affairs to them to manage and they will attend to the collections and I suppose ask you to return her papers. I told her you expected to come out soon and she said 'He won't have a chance to make a fool of me again.' The doctor had been there and said she was able to transact business so that is that. She told the two men that you had 'better than $8000.00 and 2300 from her stock' that you were to invest it and put the securities in an envelope with her name on it, etc. Well it is too bad but it will relieve you of a big responsibility. She is looking fine—better than before she took sick. . . ." The letters do not support appellant's statements that Mrs. Empey advised appellant that Mrs. Goldstrass hated him and he "was not to come back to Glendale." The letters do not support his argument to the effect that Mrs. Empey caused an estrangement between him and his sister; and the letters do not support his argument that she was present when the trust agreement was executed. Mrs. Empey testified that she was not present when Mrs. Goldstrass signed the trust agreement, but that Mrs. Goldstrass told her what had occurred. Mrs. Empey testified further that she had known Mrs. Goldstrass since 1923 and they had visited each other often; she had seen Mrs. Goldstrass two or three times a week for approximately 30 years; after Mrs. Goldstrass returned from New Jersey in 1947, she was in Mrs. Empey's house practically every day. It is apparent that the acts of Mrs. Empey in asking about the rent check for November at the request of appellant, in cashing the $35 check for Mrs. Goldstrass, and in visiting and talking with her at the sanitarium were acts of a good friend and neighbor in an effort to be of assistance. There was no evidence that Mrs. Empey concealed or committed any fraud.

There was no evidence to the effect that defendant Irene Mossoni (operator of the sanitarium) was involved in any way in the execution of the trust agreement. Appellant does not refer to her in his brief.

■ "[A] nonsuit may be granted only when, disregarding conflicting evidence, giving to the plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference which may be drawn from that evidence, the court properly determines that there is no substantial evidence to support a verdict in favor of the plaintiff."

(*Leonard* v. *Watsonville Community Hospital,* 47 Cal.2d 509, 514-515 [305 P.2d 36].) ▮ "The right of a court to direct a verdict is the same as the right of a court to grant a nonsuit." (*Gish* v. *Los Angeles Ry. Corp.,* 13 Cal.2d 570, 573 [90 P.2d 792].) Appellant's arguments regarding fraud and conspiracy are speculative and conjectural.

▮ Appellant contends, in effect that the evidence showed that Mrs. Goldstrass was incompetent at the time she executed the trust agreement, and that the agreement was void. This is not an action to set aside the agreement. It is an action for damages resulting from fraud and conspiracy in inducing the execution of a trust agreement. The alleged incompetency of Mrs. Goldstrass was material only on the issue as to whether she was induced by fraud to execute the agreement. No issue is presented as to whether the agreement was void.

Appellant contends that the court erred in granting the motions of defendant to strike, from the sixth amended complaint, the allegations concerning damages sustained by Mrs. Goldstrass through the loss of interest on money, and through the sale of her residence. In view of the orders granting motions for nonsuits and for a directed verdict, it is not necessary to discuss the ruling with reference to striking out allegations as to damages.

In view of the above conclusions, it is not necessary to discuss other contentions on appeal. Some of the other contentions on appeal pertain to: the affirmative defenses; appellant's request for special verdicts; and the denial of appellant's motion for judgment notwithstanding the verdict.

The judgments are affirmed.

Vallée, J., concurred.

Shinn, P. J., did not participate.

A petition for a rehearing was denied May 3, 1957, and appellant's petition for a hearing by the Supreme Court was denied May 29, 1957.